# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL PFAS CONTAMINATION
COALITION
C/o Community Action Works
294 Washington Street, #500
Boston, MA 02108;

SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612; and

UNION OF CONCERNED SCIENTISTS
2 Brattle Square
Cambridge, MA 02138,

*Plaintiffs,*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

and MICHAEL REGAN, in his official
capacity as Administrator of the United
States Environmental Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460,

*Defendants.*

Civil Action No. 22-132

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

The National PFAS Contamination Coalition, Sierra Club, and Union of Concerned

Scientists ("Plaintiffs") challenge two final rules promulgated by the United States

Environmental Protection Agency ("EPA"): Implementing Statutory Addition of Certain Per-

and Polyfluoroalkyl Substances; Toxic Chemical Release Reporting, 85 Fed. Reg. 37,354 (June

22, 2020) (to be codified at 40 C.F.R. pt. 372) ("2020 Rule") (attached as **Exhibit 1**) and

Implementing Statutory Addition of Certain Per- and Polyfluoroalkyl Substances (PFAS) to the Toxics Release Inventory Beginning With Reporting Year 2021, 86 Fed. Reg. 29,698 (June 3, 2021) (to be codified at 40 C.F.R. pt. 372) ("2021 Rule") (attached as **Exhibit 2**). Together, the 2020 Rule and the 2021 Rule are referred to herein as the "TRI PFAS Rules."

## I.    INTRODUCTION

1.    For decades, communities around the country have been drinking water poisoned with per- and polyfluoroalkyl substances ("PFAS")—a large family of highly toxic, synthetic chemical substances linked to many serious health harms—without knowing it.

2.    The PFAS that have contaminated drinking water across the country primarily originate from industrial facilities where PFAS are manufactured or used, as well as from military bases, commercial airports, and petroleum refineries that use firefighting foam containing PFAS to fight flammable liquid fires. They are also widely used in consumer products such as cookware, rugs, furniture, personal care products, and food packaging.

3.    Although EPA has been aware of the dangers and widespread use of PFAS for decades, it has never on its own volition added any PFAS to the Toxics Release Inventory ("TRI")—a public database established by the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. §§ 11001 *et seq.*, to ensure communities have information about dangerous chemicals they may be exposed to and government officials and researchers have information that can assist in investigation, planning, and policy development.

4.    Recognizing the importance of providing communities with information about uses and releases of PFAS from nearby facilities, in the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 7321, 133 Stat. 1198, 2277–81 (2019) ("2020 NDAA"), Congress specified a list of PFAS and categories of PFAS that "shall be deemed to be included

in the [TRI]" effective January 1, 2020—and with a reporting threshold significantly lower than the default threshold. 15 U.S.C. § 8921(b). Congress further provided that additional PFAS "shall be deemed to be included in the [TRI]"—also at the very low reporting threshold—if EPA concluded certain types of assessments for those PFAS. *Id.* § 8921(c).

5.      The TRI PFAS Rules add 175 PFAS that the 2020 NDAA "deemed to be included" in the TRI to the TRI list in the Code of Federal Regulations, but in a manner that allows polluting facilities to utilize two regulatory exemptions to EPCRA's reporting mandates—the *de minimis* concentration and alternate threshold exemptions—in violation of the 2020 NDAA and EPCRA. The TRI PFAS Rules are also arbitrary and capricious because they are premised on the idea that communities do not need to know about releases of small amounts of toxic chemicals, or even releases of large amounts where the chemical of concern is present in low concentrations, flouting evidence that exposure to even extremely low levels of PFAS is dangerous. EPA adopted these rules without providing the public with notice and opportunity for comment, asserting that its action was a ministerial implementation of the 2020 NDAA's plain directive. However, Congress did not direct EPA to make reporting subject to the *de minimis* concentration and alternate threshold exemptions. If EPA had discretion to subject the 175 PFAS to these reporting exemptions, then the rules were not ministerial and their promulgation violated the notice and comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553.

6.      As a result of the *de minimis* concentration and alternate threshold exemptions, Plaintiffs' members are deprived of critical information. Some of them are well aware that they live in communities with high levels of PFAS in the environment, though they do not know which PFAS continue to be released from nearby facilities or in what volume; others do not

know whether they are being exposed to PFAS from facilities in their communities. Additionally, scientists and researchers focused on PFAS are deprived of information about PFAS pollution that would inform their work. Were it not for the illegal exemptions in the TRI PFAS Rules, Plaintiffs and their members would have a greater ability to know about the toxic air and water pollution that they and their families are exposed to, to advocate for stronger protections from that pollution, and to conduct the research and analysis needed to inform communities and guide policy development.

## II.     JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant).

8.      The relief requested is authorized by 5 U.S.C. § 706(2) and 28 U.S.C. §§ 2201–2202. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a) (declaratory judgments).

9.      Plaintiffs have a right to bring this action pursuant to the APA, 5 U.S.C. § 702.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) because Defendant EPA has its principal place of business in this judicial district.

## III.    PARTIES

A.    <u>Plaintiffs</u>

11.     The National PFAS Contamination Coalition ("NPCC"), which currently has thirty member groups in seventeen states, was formed in June 2017 by local leaders from around the country whose community drinking water sources are contaminated by PFAS. Many NPCC leaders, as well as their children and other close family members, have suffered from cancer and other serious health problems linked to PFAS exposure. NPCC supports its local members by

seeking federal policies that will benefit all PFAS-contaminated communities, including, for example: stronger disclosure requirements so communities know what they are being exposed to; more funding for studies of the health impacts of PFAS exposure; enforceable drinking water standards; and rigorous clean-up and remediation requirements. In addition, NPCC members share data, news, and information that supports their local advocacy. Many of the NPCC's member groups have their own members. For example, one of the NPCC members is Merrimack Citizens for Clean Water ("MCCW"), which was founded in 2016 by residents of Merrimack, New Hampshire after it was revealed that two of the town's six public water wells and hundreds of private water wells in the greater Merrimack area were contaminated with PFAS at concentrations about the federal health advisory level.

12.     MCCW and its members have a strong interest in knowing what PFAS are used and released, and in what quantities, by a facility located in Merrimack that is known to use PFAS. However, that facility did not submit any information as part of the 2020 TRI reporting cycle. Other NPCC members also received less information from the 2020 TRI reporting cycle than they expected. For example, several NPCC member groups are located near military bases, which are known to be a major source of PFAS contamination, but no military bases reported to EPA as part of the 2020 TRI reporting cycle.

13.     NPCC, its member organizations, and the members of its member organizations are injured by the TRI PFAS Rules because the *de minimis* concentration and alternate threshold reporting exemptions reduce the information that is publicly disclosed about manufacture, processing, use, and environmental releases of the TRI-listed PFAS by facilities in their communities. This loss of information interferes with the core mission of NPCC and its members

to advocate for stronger protections from PFAS, and it interferes with their members' abilities to protect themselves from PFAS exposure.

14.     Sierra Club is a national environmental nonprofit, organized and existing under the laws of the state of California, with its headquarters located in Oakland, California. The organization has sixty-seven state-based chapters and approximately 837,000 members across all fifty states and the District of Columbia. Sierra Club members pay annual dues that help to finance the programs and activities of the organization, and they also have voting rights to elect Sierra Club's Board of Directors. Sierra Club's mission is to preserve and protect the places where people live, work, and play, and its members are especially focused on reducing environmental and health disparities for communities that are highly impacted by toxic chemicals.

15.     Robust and reliable information on toxic chemicals is crucial to Sierra Club's goal to protect communities and the environment. Sierra Club members are engaged on a national and local chapter level in advocating for stronger regulation of PFAS. Information on PFAS uses, industries, relevant environmental media, and facility releases would enable Sierra Club to identify communities where PFAS exposures are most intense; to alert and inform residents, environmental leaders, and elected officials who have a stake in shaping regulations; and to advocate for more discrete, health-protective regulations on a national and state level.

16.     Sierra Club and its members are injured by the TRI PFAS Rules as many of its advocacy areas are constrained by the limited scope of data available and would be greatly bolstered with complete TRI data on PFAS. One example is its campaign on PFAS disposal. The current scope of data, from the TRI and other sources, that is available to Sierra Club members and staff makes it difficult to ascertain extensive and accurate information about where PFAS

waste is being sent for incineration, which facilities are sending the waste, and the level of

releases into the environment. As a result, Sierra Club is unable to identify and alert communities

that could be impacted by nearby incinerators receiving concentrated PFAS waste nor can the

organization develop strategic advocacy efforts that hone in on the industries or routes of

exposure that are most harmful to communities. As they stand, the TRI PFAS Rules pose a major

limitation on a tool that would otherwise be incredibly useful to Sierra Club's mission and work.

17.     The Union of Concerned Scientists ("UCS") is a national not-for-profit

membership organization with the mission of conducting scientific analysis and research in the

public interest and representing the interests of the scientific community before all levels of the

U.S. government. UCS scientists and analysts research and write reports on science-based policy

matters so that the public is well informed and so that communities have scientifically sound

information that they can use in their fights for clean air, clean water, and healthy environments.

A key goal of these reports is ensuring that justice and equity inform the implementation of

science-based solutions.

18.     Over the last several years, UCS has written two reports about PFAS

contamination. In 2018, UCS staff wrote a report on PFAS contamination of groundwater and

drinking water surrounding U.S. military bases. UCS, *A Toxic Threat* (Sept. 25, 2018),

https://www.ucsusa.org/resources/toxic-threat-pfas-contamination-military-bases. In 2019, they

wrote a report on how a lack of federal science-based policies is exacerbating health harms

facing communities—such as low-income communities, Indigenous communities, and

communities of color—who are already impacted by disproportionately high levels of exposure

to toxic chemicals such as PFAS. Anita Desikan et al., UCS, *Abandoned Science, Broken

Promises* (Oct. 23, 2019), https://www.ucsusa.org/resources/abandoned-science-broken-

promises. In addition, UCS scientists and analysts work directly with heavily polluted communities to develop information, such as pollution maps, that they can use to apprise the community of dangers and to engage in local advocacy. The TRI is a critical tool for this work. One of UCS's programs is the UCS Science Network, which is a membership organization for scientists with or working toward advanced degrees in life, physical, mathematical, or social sciences; professionals with or working towards advanced degrees in medicine or public health; engineers; and people with expertise in science history or science policy. These scientists rely on data disseminated by government entities, including at times the TRI. As a science-based advocacy organization, UCS has a direct interest in ensuring that information provided on federal databases is as robust as possible, including that all information required by law be available to researchers.

19.     The TRI PFAS Rules injure UCS and its members by reducing the level of community-level data on PFAS pollution. This deprivation of information interferes with UCS's ability to develop reports and provide PFAS-impacted communities with information about what they are exposed to, and it also limits the data available to the members of its Science Network.

B.     Defendants

20.     The U.S. Environmental Protection Agency ("EPA") is the agency of the federal government of the United States tasked with protecting human health and the environment. The EPA implements, through its Administrator, EPCRA and the TRI.

21.     Defendant Michael Regan is the Administrator of the EPA. He is sued in his official capacity.

## IV.    FACTUAL ALLEGATIONS

22.     More than a thousand PFAS chemicals have been manufactured in, or imported

into, the United States and are used in hundreds of industrial processes and products, including

as a part of firefighting foam used to fight liquid flammable fires at military bases, airports, and

refineries. As a result of their widespread use and the limited regulation of their manufacture,

disposal, and releases into the environment, PFAS are now pervasive environmental

contaminants.

23.     Human exposure to several well-studied and widely produced PFAS has been

linked to a variety of adverse health effects, including cancer, elevated cholesterol, immune

suppression, preeclampsia, liver and kidney damage, and endocrine disruption. Agency for Toxic

Substances & Disease Registry, CDC, *Toxicological Profile for Perfluoroalkyls* (2021) ("PFAS

Tox Profile"), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

24.     Federal and state agencies have acknowledged the risks associated with

PFAS chemicals. For example, the Centers for Disease Control and Prevention ("CDC") reports

that long-term PFAS exposure "can be linked to higher rates of certain cancers, higher

cholesterol levels, suppressed immune systems, fertility issues in women, and weakened

antibody responses to vaccinations among children." Agency for Toxic Substances & Disease

Registry, CDC, *ATSDR Leads Charge to Reduce PFAS Exposure* 1 (2017),

https://www.atsdr.cdc.gov/2017dchiannualreport/assets/pdf/ATSDR_Annual_Report_PFAS_Suc

cess_Story-508.pdf. EPA has linked PFAS exposure with "cancer (e.g., testicular, kidney), liver

effects (e.g., tissue damage), immune effects (e.g., changes in antibody production and

immunity), thyroid effects related to developmental outcomes, and other effects (e.g., cholesterol

changes)." EPA, 823R18004, *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*,

at 13 (2019) ("PFAS Action Plan"), https://www.epa.gov/sites/default/files/2019-02/documents/pfas_action_plan_021319_508compliant_1.pdf.

25.     Children, infants, and the developing fetus are more susceptible to harm from PFAS exposures. PFAS can transfer across the placenta and have been detected in umbilical cord blood, putting the developing fetus at risk of exposure. Even at low levels, exposure to PFAS during early life can result in developmental harm, including low birth weight, skeletal variations, delayed puberty, and reduced antibody response following childhood vaccinations. *Id.*; PFAS Tox Profile.

26.     Many of these harms occur at very low exposure levels. The CDC's Agency for Toxic Substances and Disease Registry has identified drinking water screening levels— concentrations of PFAS in water that it expects will result in "minimal risk" to children—of approximately 21 parts per trillion and 14 parts per trillion for PFOA and PFOS, respectively, though many scientists believe these values are not sufficiently protective. For purpose of comparison, one part per trillion is approximately equal to a single grain of sand in an Olympic-sized swimming pool.

27.     In addition to being toxic at low levels of exposure, PFAS are also extremely persistent and difficult to break down or remediate. Many PFAS also have bioaccumulative qualities (i.e., they can build up in living organisms over time). Thus, many PFAS fall within the class of chemicals known as "persistent, bioaccumulative, and toxic" ("PBT") chemicals.

28.     As a result of their widespread and largely unregulated use, virtually all people in the United States are routinely exposed to some PFAS, and some PFAS have been detected in more than 98% of people living in the United States. PFAS Action Plan at 9.

29.     PFAS-contaminated drinking water is a significant source of exposure, though information about that has come to light only recently. In or around 2015, results of testing of large public drinking water systems, required by EPA, revealed that many drinking water supplies around the country are contaminated with PFAS.

30.     A 2016 study estimated that 16.5 million people across thirty-three states, three U.S. territories, and the Salt River Pima-Maricopa Indian Community were supplied drinking water with levels of PFAS at or above minimum reporting levels. Xindi C. Hu et al., *Detection of Poly- and Perfluoroalkyl Substances (PFASs) in U.S. Drinking Water Linked to Industrial Sites, Military Fire Training Areas, and Wastewater Treatment Plants*, 3 Env't Sci. & Tech. Letters 344 (2016), https://pubs.acs.org/doi/pdf/10.1021/acs.estlett.6b00260.

31.     The 2016 study, however, likely underestimates how many people in the U.S. are drinking water contaminated with PFAS, the level of PFAS in U.S. drinking water, and the extent to which individuals are potentially harmed by this PFAS contamination because: (1) the testing methodologies reflected in this study only examined six out of the thousands of PFAS in circulation; and (2) the PFAS reporting levels used in this study were up to 100 times higher than levels typically tested for in the environment and more than ten times higher than levels associated with adverse health effects.

32.     A subsequent nationwide study examining PFAS in drinking water at much lower reporting levels revealed that over 200 million people in the United States likely drink water polluted with dangerous levels of PFOA and PFOS, PFAS that are well-studied and known to be very toxic to human health. David Q. Andrews & Olga V. Naidenko, *Population-Wide Exposure to Per- and Polyfluoroalkyl Substances from Drinking Water in the United States*, 7 Env't Sci. & Tech. Letters 931 (2020), https://doi.org/10.1021/acs.estlett.0c00713.

33.     As the PFAS crisis has unfolded, scientists have found that the manufacturing and use of products containing even trace volumes or concentrations of PFAS can result in significant threats to public health and the environment. This phenomenon is largely attributable to the persistent nature of PFAS, which makes them resistant to environmental degradation and more likely to bioaccumulate to dangerous levels in living organisms. For example, the State of Minnesota linked high levels of PFAS contamination of fish in a lake to a nearby chrome plating facility that was releasing no more than one gram of a particular PFAS (known as PFOS) per year through fume suppressants escaping from air vents. After an extensive investigation, Minnesota regulators concluded that over time, these extremely low levels of releases built up to concentrations in fish that exceeded the state's Water Quality Criteria for fish consumption. *See* Minn. Pollution Control Agency, *Comments on Addition of Certain Per- and Polyfluoroalkyl Substances: Community Right-to-Know Toxic Chemical Release Reporting,* Docket No. EPA-HQ-TRI-2019-0375-0057, at 4 (Jan. 30, 2020), https://www.regulations.gov/comment/EPA-HQ-TRI-2019-0375-0057.

34.     The release of products containing trace concentrations of PFAS can also pose risks to human and environmental health. For example, the historic and ongoing use of Class B military-grade firefighting foams containing a commercial PFAS mixture has contaminated drinking water at hundreds of military and industrial sites, and surrounding communities, with PFAS even though the PFAS constitute approximately three to six percent of the total product, or in some instances less. This is in part because during use, firefighting foam is released in large volumes, meaning that even low concentrations of PFAS can amount to high volumes of total releases.

35.     The full scope of PFAS contamination remains unknown for a variety of reasons, including that not all public water systems have been tested for PFAS, many private wells have not been tested for PFAS, and validated analytical methods for identifying PFAS in water exist for only a few dozen out of thousands of PFAS in existence. The fact that facilities that manufacture, use, and release PFAS have not had to report their activities—at least until the TRI PFAS Rules—is a major reason that the extent and location of PFAS contamination are unknown.

36.     As the scale of the PFAS crisis has come into focus within the last several years, communities around the country have sought information about whether the air they breathe and the water they drink is contaminated with PFAS, and if so: what levels of PFAS are present, which PFAS are present, and how did the PFAS get there.

37.     Although the TRI is designed to help people know what toxic chemicals are released into their communities, EPA has added no PFAS to the TRI on its own volition.

## V.     STATUTORY AND REGULATORY BACKGROUND

A.     EPCRA

38.     Congress passed EPCRA in 1986 after the tragic chemical disaster in Bhopal, India that killed thousands of people and exposed half a million people to a highly toxic gas; Congress did so to ensure a similar tragedy would not occur in the United States. One of the bill sponsors noted that "[t]o respond to spills and leaks of chemicals, we need to know where facilities are located, what chemicals they use or produce, and in what volume these chemicals are released on a routine basis." 131 Cong. Rec. 131 (1985) (statement of Sen. Lautenberg).

39.     A critical component of EPCRA is the TRI, a publicly accessible database that contains information reported by "covered facilities" about their use and environmental releases

of toxic chemicals (or chemical classes) that are listed on the TRI. 42 U.S.C. § 11023(a), (g).

"Covered facilities" are those that both "manufactured, processed, or otherwise used" a listed

toxic chemical in a quantity that exceeds the established threshold for that toxic chemical during

the prior year and that are in Standard Industrial Classification Codes set forth in EPCRA. *Id.* §

11023(b)(1)(A).

40.     The TRI database is compiled and published by EPA from "toxic chemical release

forms" that covered facilities submit annually for each TRI-listed chemical that they

"manufactured, processed, or otherwise used" in the prior year in a quantity exceeding the

threshold for that chemical. *Id.* § 11023(a), (j). The toxic chemical release forms require covered

facilities to report, *inter alia*, the quantity of the chemical that is released, emitted, or discharged

into "each environmental medium." *Id.* § 11023(g)(1)(C)(iv).

41.     At the time of passage, Congress added over 300 toxic chemicals and categories

of chemicals to the initial TRI list, *id.* § 11023(c), and specified that the default "threshold

amount" that would trigger TRI reporting is 25,000 pounds per year for chemicals manufactured

or processed at a facility and 10,000 pounds per year for chemicals used at a facility, *id.* §

11023(f)(1).

42.     EPA later adopted 40 C.F.R. § 372.65, which codified the initial list of TRI

chemicals and set the reporting thresholds for all of those chemicals as the statutory default

thresholds described immediately above. *See* Toxic Chemical Release Reporting; Community

Right-to-know, 53 Fed. Reg. 4500 (Feb. 16, 1988) (to be codified at 40 C.F.R. pt. 372).

B.      EPA'S REGULATORY REPORTING EXEMPTIONS AND CARVEOUTS FOR
        CHEMICALS OF SPECIAL CONCERN

43.     Shortly after EPCRA's adoption, EPA adopted two regulations that create

exemptions to the broad reporting mandated by Congress. First, in 1988, EPA established a *de*

*minimis* concentration exemption to TRI reporting for certain chemical mixtures. *See id*. Under the *de minimis* concentration exemption, when a TRI-listed chemical is part of a chemical mixture and is present in the mixture at a low concentration (defined as less than 1% if it is not a carcinogen and less than 0.1% if it is), the manufacture, processing, or use of that mixture does not count toward the threshold that triggers TRI reporting. 40 C.F.R. § 372.38(a). This means that if such a chemical mixture is released into the environment, it need not be reported to the TRI. The *de minimis* concentration exemption applies—and therefore limits the information EPA receives—regardless of the total volume of the relevant mixture that is manufactured, processed, or otherwise used and regardless of the total volume that is released into the environment.

44.     Second, in 1994, EPA established an "alternate threshold" for reporting available to certain facilities. Alternate Threshold for Facilities With Low Annual Reportable Amounts; Toxic Chemical Release Reporting; Community Right-To-Know, 59 Fed. Reg. 61,488, 61,502 (Nov. 30, 1994) (to be codified at 40 C.F.R. pt. 372). Under this provision, a covered facility may use an "alternate threshold" of 1,000,000 pounds per year for manufacturing, processing, or otherwise using the chemical—a far higher threshold for reporting than the statutory default reporting thresholds in 42 U.S.C. § 11023(f)(1)—if it certifies that its reportable releases and disposals were 500 pounds or less combined. 40 C.F.R. § 372.27(a). If a facility determines it is eligible for the 1,000,000-pound alternate reporting threshold, it need not submit a toxic chemical release form, but instead can submit only a barebones certification. 40 C.F.R. §§ 372.27, 372.95. The most significant information that must be included on the toxic chemical release form, such as environmental release information, need not be provided by facilities using the alternate threshold.

45.     The *de minimis* concentration exemption limits the information obtained about toxic chemicals in two additional ways. First, it applies to calculation of manufacture, processing, and otherwise use of a chemical mixture for purposes of determining eligibility for the alternate threshold exemption. 40 C.F.R. § 372.27(c). Second, EPA's 1988 regulations also include a "supplier notification" provision pursuant to which TRI-covered facilities that sell or distribute a mixture or trade name product containing a TRI-chemical to a regulated facility (or to a person who will then sell the mixture or trade name product to a regulated facility) must provide notice that the product contains a chemical subject to TRI reporting. *Id.* § 372.45(a), (b). However, supplier notification is not required if the mixture is subject to the *de minimis* concentration exemption. *Id.* § 372.45(d)(1).

46.     In 1999, EPA adopted a rule that added chemicals or chemical classes to the TRI with reporting thresholds of 100 pounds or less. *See*, *e.g.*, Persistent Bioaccumulative Toxic (PBT) Chemicals; Lowering of Reporting Thresholds for Certain PBT Chemicals; Addition of Certain PBT Chemicals; Community Right-to-Know Toxic Chemical Reporting, 64 Fed. Reg. 58,666 (Oct. 29, 1999) (to be codified at 40 C.F.R. pt. 372) ("TRI PBT Rulemaking"). These chemicals are not listed in 40 C.F.R. § 372.65 along with the other TRI chemicals.  Rather, EPA added a new section to the Code of Federal Regulations, entitled "Lower thresholds for chemicals of special concern," 40 C.F.R. § 372.28, and added the PBT chemicals to the TRI by listing them in this new provision.

47.     As part of the TRI PBT Rulemaking, EPA amended the *de minimis* concentration exemption so that it did not apply to the newly added PBT chemicals with a lower reporting threshold. *Id.* § 372.38(a)(2).

48.     EPA based its decision to make the PBT chemicals ineligible for the *de minimis* concentration exemption on the fact that PBTs raise health and environmental concerns at very low levels, so information is needed about the use and releases of those chemicals at low levels, even if they are found in a mixture. EPA reasoned that:

> The purpose of the PBT rulemaking . . . is different from past rulemakings in that it is intended to capture information on significantly smaller quantities of releases and other waste management associated with these chemicals. Most of the PBT chemicals addressed in this rule have been shown to cause adverse effects at concentrations far less than the de minimis levels.

64 Fed. Reg. at 58,727. EPA further stated that "the small *concentrations* subject to the de minimis exemption are not necessarily small *quantities* and may contribute significantly to exceeding the lowered reporting thresholds." *Id*. at 58,728 (emphases added).

49.     In addition, as part of the TRI PBT Rulemaking, EPA amended the alternate threshold exemption so that it did not apply to the PBT chemicals with a lower reporting threshold. 40 C.F.R. § 372.27(e).

50.     EPA stated that use of the alternate threshold would be "inconsistent with the intent of expanded" reporting for PBTs, and it noted that the limited information that covered facilities must provide using the alternate threshold exemption "would be virtually useless for communities interested in assessing risk from releases and other waste management of PBT chemicals." 64 Fed. Reg. at 58,670.

C.     2020 NDAA

51.     In response to the broad public demand for more information about environmental releases of PFAS, in the 2020 NDAA, Congress added certain PFAS to the TRI in two ways. First, it listed specific PFAS and categories of PFAS that "beginning January 1 of the calendar year following December 20, 2019, . . . shall be deemed to be included in the toxics release

inventory." 15 U.S.C. § 8921(b). Second, Congress mandated that other PFAS "shall be deemed to be included in the toxics release inventory" beginning January 1 of the year after they are subject to any of several actions by the EPA Administrator, such as when EPA finalizes a toxicity value for a PFAS or class of PFAS. *Id.* § 8921(c).

52.    Insofar as the 2020 NDAA stated in 15 U.S.C. § 8921(b), (c) that the PFAS identified in those sections were "deemed to be included in the [TRI]" upon the triggering events, once the trigger occurred, they were automatically listed in the TRI regardless of whether EPA amended the Code of Federal Regulations. These PFAS are referred to herein as the "statutorily listed PFAS."

53.    The threshold for reporting the statutorily listed PFAS is 100 pounds. 15 U.S.C. § 8921(b)(2)(A), (c)(2)(A). This reporting threshold is subject to revision by EPA within five years of December 19, 2020, for the PFAS subject to immediate inclusion, and no later than five years after the date that a PFAS is added to the TRI based on a triggering event. *Id.* § 8921(b)(2)(B), (c)(2)(B).

D.    <u>EPA ADOPTS REGULATIONS ADDING THE STATUTORILY LISTED PFAS TO THE CODE OF FEDERAL REGULATIONS</u>

54.    EPA promulgated the TRI PFAS Rules to add 175 statutorily listed PFAS to the formal listing of TRI chemicals in the Code of Federal Regulations.

55.    Despite the 100-pound reporting threshold, the TRI PFAS Rules add the statutorily listed PFAS to 40 C.F.R. § 372.65 (and specifically subsections (d) and (e) thereof), which is the section of the Code of Federal Regulations for TRI-listed chemicals that are subject to the statutory default thresholds of 25,000 pounds for manufacture and processing and 10,000 pounds for use, 42 U.S.C. § 11023(f)(1); 40 C.F.R. § 372.25(a). Then, to clarify that PFAS are not subject to the same default thresholds as all the other chemicals listed in 40 C.F.R. § 372.65,

EPA adopted a separate regulation, 40 C.F.R. § 372.29, which specifies that "[n]otwithstanding" that all of the other toxic chemicals listed in 40 C.F.R. § 372.65 are subject to the statutory default threshold reporting levels, "the manufacturing, processing, and otherwise use thresholds [for PFAS] are 100 pounds." 40 C.F.R. § 372.29.

56.     By adding the statutorily listed PFAS to 40 C.F.R. § 372.65, EPA subjects these chemicals to the *de minimis* concentration exemption, meaning that some statutorily listed PFAS will not be reported to the TRI because they are used in mixtures in low concentrations—even where the total amount of the PFAS manufactured, processed, or otherwise used is well over the 100-pound threshold set by Congress. For statutorily listed PFAS that are not reported to the TRI due to the *de minimis* concentration exemption, no environmental release information will be reported to the TRI.

57.     In addition, by adding the statutorily listed PFAS to 40 C.F.R. § 372.65, EPA allows facilities to sell or distribute products containing these PFAS without providing notice that the product they are selling or distributing contains TRI-listed PFAS.

58.     In addition, by adding the statutorily listed PFAS to 40 C.F.R. § 372.65, EPA permits facilities that manufacture, process, or otherwise use up to 1,000,000 pounds per year of a TRI-listed PFAS and whose combined releases and disposals are less than 500 pounds per year, to take advantage of the "alternate threshold" and submit a bare-bones certification rather than the detailed toxic chemical release form, reducing the information disclosed to the public.

59.     In sum, the TRI PFAS Rules significantly limit the information that must be reported about statutorily listed PFAS.

60.     The TRI PFAS Rules were adopted as final rules, without a notice of proposed rulemaking and without the opportunity for public comment. Implementing Statutory Addition of

Certain Per- and Polyfluoroalkyl Substances; Toxic Chemical Release Reporting, 85 Fed. Reg. 37,354 (June. 22, 2020) (to be codified at 40 C.F.R. pt. 372); Implementing Statutory Addition of Certain Per- and Polyfluoroalkyl Substances (PFAS) to the Toxics Release Inventory Beginning With Reporting Year 2021, 86 Fed. Reg. 29,698 (June 3, 2021) (to be codified at 40 C.F.R. pt. 372). In both instances, EPA took the position that the notice and comment requirements of the APA are unnecessary and do not apply because the Rules were adopted pursuant to directives in the 2020 NDAA and reflected no exercise of discretion on EPA's part. 85 Fed. Reg. at 37,356; *see also* 86 Fed. Reg. at 29,700.

E.     RESULTS OF TRI REPORTING OF PFAS

61.     Calendar year 2020 was the first reporting cycle for statutorily listed PFAS with 172 PFAS subject to reporting for that period. Based on final data released by EPA in October 2021, only thirty-nine facilities in the United States reported that they had "manufactured, processed, or otherwise used" one of the 172 PFAS. Many facilities that are known to manufacture and use PFAS did not report, including Saint-Gobain Performance Plastics (which has polluted Hoosick Falls, NY and Merrimack, NH) and the U.S. Department of Defense.

62.     Although 172 PFAS were subject to reporting, only forty-three PFAS were reported to have been manufactured, processed, or otherwise used over the 100-pound threshold.

63.     And only twenty facilities in the nation reported releases of TRI-listed PFAS in 2020, with those that did report listing low volumes of PFAS releases. Some facilities that were reported to have received a waste transfer of a TRI-listed PFAS at a volume over 100 pounds did not report their "use" of the PFAS.

64.     In nine instances, facilities used the alternate threshold exemption, meaning that they submitted a barebones certification form rather than the full-blown toxic chemical release reporting form required by EPCRA.

65.     EPA has admitted that "exemptions and exclusions," such as the "de minimis exemption [and] supplier notification requirements, and applicability of those requirements to wastes" "significantly limited the amount of data that EPA received for [TRI-listed PFAS] in the first year of reporting." EPA, *PFAS Strategic Roadmap: EPA's Commitments to Action 2021–2014*, at 12, 23 n.iv (Oct. 2021), https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf.

## VI.     FIRST CLAIM FOR RELIEF – VIOLATION OF THE 2020 NDAA

66.     Plaintiffs incorporate by reference and re-allege all allegations set forth in the preceding paragraphs.

67.     The 2020 NDAA added two sets of PFAS to the TRI and set an initial reporting threshold for these PFAS of 100 pounds. 15 U.S.C. § 8921(b)(2)(A), (c)(2)(A).

68.     Under the terms of EPCRA and the 2020 NDAA, facilities that manufacture, process, or otherwise use the statutorily listed PFAS in quantities exceeding the 100-pound reporting threshold must submit a toxic chemical release form containing the information specified in 42 U.S.C. § 11023(g). 42 U.S.C. § 11023(a); 15 U.S.C. § 8921(b)(2)(A), (c)(2)(A).

69.     At the time the 2020 NDAA was adopted, the *de minimis* concentration and alternate threshold exemptions did not apply to any chemical in the TRI with reporting thresholds of 100 pounds or less. *See* 40 C.F.R. § 372.38(a)(2). Because the *de minimis* concentration exemption did not apply to chemicals with lower reporting thresholds, the supplier notification provision always applied to those chemicals.

70.     Congress intended for the statutorily listed PFAS to be treated the same as other toxic chemicals in the TRI with reporting thresholds of 100 pounds.

71.     The 2020 NDAA does not say that covered facilities are exempt from reporting if they manufacture, process, or otherwise use any statutorily listed PFAS in an amount exceeding the 100-pound threshold, so long as the PFAS is part of a mixture where the concentration of PFAS in the mixture is less than 1%.

72.     The 2020 NDAA does not say that covered facilities that manufacture, process, or otherwise use any statutorily listed PFAS in amounts exceeding the 100-pound threshold are exempt from submitting a toxic chemical release form containing the information specified in 42 U.S.C. § 11023(g), based on a certification that they manufacture, process, or otherwise use less than 1,000,000 pounds of the substance, and release 500 pounds or less.

73.     Ignoring the plain language of EPCRA and the 2020 NDAA, and Congress's intent in the 2020 NDAA, EPA added the statutorily listed PFAS to the Code of Federal Regulations in a manner that subjects their reporting to the *de minimis* concentration and alternate threshold exemptions and limits the applicability of the supplier notification requirement.

74.     Because the TRI PFAS Rules create reporting exemptions for the statutorily listed PFAS that treat the statutorily listed PFAS differently than other TRI-listed chemicals with a reporting threshold of 100 pounds in contravention of Congress's intent and are not authorized by the terms of the 2020 NDAA, they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of [EPA's] statutory jurisdiction," and "without observance of procedure required by law," and thus, they are in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

## VII.   SECOND CLAIM FOR RELIEF – VIOLATION OF EPCRA

75.    Plaintiffs incorporate by reference and re-allege all allegations set forth in the preceding paragraphs.

76.    EPCRA requires owners or operators of "covered facilities" to complete a toxic chemical release form for each TRI-listed toxic chemicals that was "manufactured, processed, or otherwise used" at that facility in the prior calendar year if it exceeds the toxic chemical threshold quantity established in 42 U.S.C. § 11023(f). 42 U.S.C. § 11023(a).

77.    Consistent with the express terms of EPCRA, EPA's only authority to exempt covered facilities from reporting on TRI-listed chemicals in compliance with the terms of 42 U.S.C. § 11023 is by: (1) modifying applicable Standard Industrial Classification Codes where "relevant to the purposes" of the TRI, *id.* § 11023(b)(1)(B); and (2) modifying the reporting threshold, but only where the new threshold would ensure "reporting on a substantial majority of total releases of the chemical at all facilities subject to" TRI requirements, *id.* § 11023(f)(1), (2).

78.    The *de minimis* concentration exemption exempts covered facilities from reporting on TRI-listed chemicals based on the concentration of the chemical in a mixture, without regard for the total amount of the chemical "manufactured, processed, or otherwise used" at that facility in the prior calendar year, without regard for whether that total amount exceeds the toxic chemical threshold quantity established in 42 U.S.C. § 11023(f), and without regard for whether the facility is "reporting on a substantial majority of total releases of the chemical at all facilities subject to the" TRI requirements. *Id.* § 11023(f)(2). The *de minimis* concentration exemption therefore falls outside the narrow set of exemptions EPA is authorized to allow, and is not permitted by EPCRA.

79.     The alternate threshold exemption allows covered facilities to avoid providing the information that they must report pursuant to 42 U.S.C. § 11023(g)(1), based on certifications related to manufacture, processing, or otherwise use of a chemical at thresholds far higher than those set by EPCRA in 42 U.S.C. § 11023(f)(1), and without regard for whether the facility is "reporting on a substantial majority of total releases of the chemical at all facilities subject to the" TRI requirements. *Id.* § 11023(f)(2). The alternate threshold exemption therefore falls outside the narrow set of exemptions EPA is authorized to allow, and is not permitted by EPCRA.

80.     Because the *de minimis* concentration exemption exceeds EPA's authority under EPCRA, its application to the statutorily listed PFAS in the TRI PFAS Rules is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of [EPA's] statutory jurisdiction," and "without observance of procedure required by law," and thus, it is in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

81.     Because the alternate threshold exemption exceeds EPA's authority under EPCRA, its application to the statutorily listed PFAS in the TRI PFAS Rules is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of [EPA's] statutory jurisdiction," and "without observance of procedure required by law," and thus, it is in violation of the APA. *Id.*

## VIII.   THIRD CLAIM FOR RELIEF – ARBITRARY AND CAPRICIOUS RULEMAKING

82.     Plaintiffs incorporate by reference and re-allege all allegations set forth in the preceding paragraphs.

83.     The APA authorizes courts reviewing agency action to hold unlawful and set aside final agency action that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

84.     It was arbitrary and capricious for EPA to add the statutorily listed PFAS to the TRI in a manner that makes them subject to the *de minimis* concentration exemption and the alternate threshold exemption—both of which are premised on a view that relatively low concentrations or levels of manufacture, processing, use, and/or release will not present danger and do not need to be publicly disclosed, despite the known fact that PFAS are toxic at very low levels of exposure.

## IX.    FOURTH CLAIM FOR RELIEF – IN THE ALTERNATIVE: VIOLATION OF APA PROCEDURES

85.     Plaintiffs incorporate by reference and re-allege all allegations set forth in the preceding paragraphs.

86.     EPA promulgated the TRI PFAS Rules as final rules without providing the public with the notice and opportunity to comment generally mandated by the APA, 5 U.S.C. § 553, asserting that public notice and comment are not required because "Congress added these chemicals to the TRI . . . and thus EPA has no discretion as to the outcome of this rule." 85 Fed. Reg. at 37,356; *see also* 86 Fed. Reg. at 29,700. Plaintiffs agree that Congress added the statutorily listed PFAS to the TRI. Plaintiffs further agree that the 2020 NDAA gave EPA no discretion as to the outcome of the rule; however, they assert that the ministerial action EPA was compelled to take was to require TRI reporting of the statutorily listed PFAS *without* application of the *de minimis* concentration exemption or the alternate threshold exemption. If the Court finds that EPA had discretion to codify the statutorily listed PFAS on the TRI such that they are subject to the *de minimis* concentration exemption or the alternate threshold exemption, then the TRI PFAS Rules do not fall within the narrow confines of the good cause exception, as public input regarding how EPA should effectuate any discretion afforded to it by the 2020 NDAA would be practicable, necessary, and in the public interest. 5 U.S.C. § 553(b)(3)(B).

87.     If the Court finds that the *de minimis* concentration exemption or the alternate threshold exemption apply, or might apply, to the statutorily listed PFAS, then EPA violated the APA's notice and comment requirements in 5 U.S.C. § 553 in its adoption of the 2020 Rule and the 2021 Rule, and therefore those Rules were adopted "without observance of procedure required by law," in violation of the APA. 5 U.S.C. § 706(2)(D).

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Issue a declaratory judgment declaring that EPA's adoption of the TRI PFAS Rules violates the 2020 NDAA, 15 U.S.C. § 8921, insofar as those Rules subject the statutorily listed PFAS to the *de minimis* concentration exemption and alternate threshold reporting exemption, which are not authorized by and contrary to the terms of the 2020 NDAA;

B.     Issue a declaratory judgment declaring that EPA's adoption of the TRI PFAS Rules violates EPCRA, 42 U.S.C. § 11023, insofar as those Rules subject the statutorily listed PFAS to the *de minimis* concentration exemption and alternate threshold reporting exemption, which are not authorized by and contrary to the terms of EPCRA;

C.     Issue a declaratory judgment declaring that EPA's adoption of the TRI PFAS Rules violates the APA, 5 U.S.C. § 706(2)(A), insofar as it is arbitrary and capricious for EPA to apply the *de minimis* concentration exemption and alternate threshold reporting exemption to PFAS in light of the fact that PFAS are known to be toxic at levels below the *de minimis* concentration and alternate threshold reporting levels;

D.     In the alternative to Paragraphs A and/or B and/or C of this Prayer for Relief, issue a declaratory judgment declaring that EPA's adoption of the TRI PFAS Rules violates the

APA, 5 U.S.C. § 553, because they were adopted without proper notice or an opportunity for public comment, in violation of the APA;

     E.     Issue a declaratory judgment declaring that, pending EPA's adoption of the revised TRI PFAS Rules in accord with this Court's decision, all of the statutorily listed PFAS covered by those rules remain subject to TRI reporting pursuant to the 2020 NDAA, without the *de minimis* concentration exemption or the alternate threshold reporting exemption;

     F.     Issue a declaratory judgment declaring that, pending EPA's adoption of the revised TRI PFAS Rules in accord with this Court's decision, all of the statutorily listed PFAS covered by those rules remain subject to the supplier notification provision;

     G.     Retain jurisdiction over this matter until Defendants have fulfilled their statutory and Court-ordered obligations;

     H.     Award Plaintiffs their costs of litigation, including reasonable out-of-pocket costs and attorneys' fees; and

     I.     Grant such additional relief as the Court deems just and proper.

Respectfully submitted this 20th day of January, 2022.

/s/ Eve C. Gartner
Eve C. Gartner
D.C. Bar ID NY0451
Amy Chyao
D.C. Bar ID NY0450
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
(212) 845-7381
(212) 284-8031
egartner@earthjustice.org
achyao@earthjustice.org

*Counsel for Plaintiffs*
